UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAM SMITH, )<br>)<br>Petitioner, )<br>v. )<br>)<br>DUANE MacEACHERN, )<br>Superintendent, )<br>)<br>Respondent. ) | CIVIL ACTION<br>NO. 09-10434-NMG |

# REPORT AND RECOMMENDATION ON
# PETITIONER'S SECOND MOTION TO STAY

February 17, 2017

DEIN, U.S.M.J.

## I. INTRODUCTION

The petitioner, Sam Smith, is currently serving a life sentence for first degree premeditated murder in the 1991 shooting death of Steven Gaul. See Commonwealth v. Smith, 450 Mass. 395, 396, 879 N.E.2d 87, 90 (2008). The matter is presently before the court on Petitioner's Second Motion to Stay (Docket No. 143) pursuant to which Smith is seeking a stay of this habeas proceeding to pursue a claim in state court that the prosecutor failed to disclose Brady[1] material, namely information about an allegedly pending joint federal and state investigation involving two percipient witnesses. Included in the motion to stay is also a request for leave to amend his habeas petition to include the Brady claim.

---

[1] Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963).

On October 29, 2015, this court issued a Report and Recommendation ("R&R") recommending that an earlier request by Smith to amend his habeas petition to include a similar Brady violation claim be denied on the grounds that it was untimely. Docket No. 119. The R&R was adopted by the District Judge on November 30, 2015. Docket No. 126. Smith's present motion is premised on his contention that he obtained new evidence of the existence of a joint state and federal investigation involving the witnesses, principally from an Affidavit of FBI Special Agent Matthew C. Knight, dated June 18, 2015 (the "Knight Affidavit"), which was filed in this court in the unrelated case of United States v. Williams, et al, Docket No. 1:15-cr-10145-RGS (the "Williams litigation").[2] After a careful review of the evidence, and consideration of the arguments, this court finds that neither the Knight Affidavit nor other evidence referred to by Smith adds any significant information to the record. Accordingly, and for the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Petitioner's Second Motion to Stay be DENIED.[3]

---

[2] The Knight Affidavit was filed in the Williams Litigation at Docket No. 8. Smith's counsel, Kevin Barron, represents a defendant in the Williams litigation, and an issue arose as to whether counsel's appearance in both cases created a conflict of interest between Smith and his counsel. See Mot. to Stay (Docket No. 135). After a hearing, it was determined that the issue of the significance of the Affidavit would be addressed in the context of a motion to stay this habeas petition, which is the subject motion of this R&R. Smith agreed to have counsel continue to represent him through this motion. A copy of the Affidavit can also be found as an exhibit to Smith's Memorandum in Support of his Second Motion to Stay (Docket No. 146).

[3] In connection with the court's ruling on the prior motion to stay, the court allowed Smith to proceed with two claims: (1) a claim that the prosecutor improperly exercised a peremptory challenge to excuse a transgendered juror, in violation of the Equal Protection Clause; and (2) a claim that the trial judge offered improper comments or instructions to the jury asserting that the petitioner had participated in a prior gang shooting, in violation of his Due Process rights. Consistent with the petitioner's requests for stays, those issues have still not been addressed by this court.

## II. STATEMENT OF FACTS[4]

The facts described herein are limited to those that are relevant to the pending motion, and borrow from this court's earlier R&R on Petitioner's Motion to Amend. Docket No. 119.

Smith was convicted by a Suffolk County jury on June 12, 2001 of murder in the first degree in the shooting death of Steven Gaul, and was sentenced to life imprisonment. SA I:10. He filed a motion for a new trial on June 24, 2004, which was denied on February 10, 2006. SA I:328, 519-32. Smith's conviction, and the denial of his motion for a new trial, were affirmed by the Massachusetts Supreme Judicial Court ("SJC") in an opinion dated January 11, 2008. Commonwealth v. Smith, 450 Mass. 395, 879 N.E.2d 87 (2008). A timely habeas petition followed.

### Facts Relating to the Brady Claim -- Overview

The present motion relates to two of the Commonwealth's witnesses at trial, Odie Calhoun and Damion Howell, both of whom had been previously convicted of federal drug offenses. Id. at 409, 879 N.E.2d at 99. By his instant motion, Smith is seeking a stay of his habeas petition to pursue a claim in state court that the Commonwealth wrongfully failed to produce "state and federal gang investigation records of [these] two percipient witnesses, despite numerous defense pretrial and post-conviction motions[.]" Pet. Mem. (Docket No. 146) at 1. The absence of this information, according to the petitioner, "undermines confidence in the outcome of petitioner's trial and conviction." Id. He is also seeking to amend his habeas petition to add this claim as a ground for relief. Id.

---

[4] The record below is included in the multi-volume Supplemental Answer ("SA") filed by the respondent (Docket Nos. 14, 102) and will be cited by volume:page.

As detailed herein, both Calhoun and Howell testified at trial, and were cross-examined concerning the benefits they had received by cooperating with the government.  It is Smith's contention, however, that the recent Knight Affidavit shows that there was an ongoing joint federal and state investigation at the time of these witnesses' testimony, which had not been previously disclosed.  Such an investigation, the argument goes, put even more pressure on these witnesses since they could have been charged federally and faced much longer sentences than they admitted to at trial.  Moreover, in light of this alleged joint investigation, state prosecutors should have been required to obtain more of the federal discovery Smith had requested.  As detailed below, this court concludes that the Affidavit does not add any significant information.

## **Trial Testimony of Calhoun and Howell**

In its decision affirming (the defendant) Smith's conviction, the SJC described the crime as follows:

> On August 16, 1991, the victim, Steven Gaul, was standing with several friends close to a park bench in Ramsey Park, near Lenox Street in the Roxbury section of Boston.  The victim lived in Columbia Point, in the Dorchester section of Boston, and was a member of a gang of young men from Columbia Point known as the Columbia Point Dawgs.  The defendant and two other men, K.J. Walker and David Walker, all wearing black hooded sweatshirts, entered the park.  The defendant and his two companions were all associated with the Lenox Street gang.  The three men approached the victim, and K.J. Walker shot him once in the stomach and then ran out of the park.  The victim fell to the ground.  The defendant then stood above him and fired several shots directly at him.  The defendant's gun jammed and there was a pause in the shooting as he removed the bullets wedged in the gun's chamber.  As he did so, the victim reached up with his hands raised.  The defendant said, "I told you I'm gonna get you, bitch," and, after reloading the gun, fired several more shots at the victim, who fell back to the ground.  Patrick Culbreath, a friend of the victim, was watching from across the park and fired several shots at the defendant, who returned Culbreath's fire.  The defendant then walked toward the park's entrance and was joined by Steven

[4]

>Kindell, who was wearing a white shirt and riding a bicycle. The two left the
>park together.

Smith, 450 Mass. at 396-97, 879 N.E.2d at 90. Howell testified that he saw the man with the black hooded sweatshirt shoot Gaul, saw the man exit the park and remove his hood, and recognized the shooter to be Smith. See SA II:295-301. Calhoun also testified that he saw three men with black hoods enter the park, including Smith whom he referred to as "Fat Sam." SA II:436-39. He saw Smith shoot Gaul, and pause to adjust and reload his gun after it had jammed. SA II:440-444. Calhoun also testified that he heard Smith say "I told you I'm gonna get you, bitch." SA II:443.

In addition to Howell and Calhoun, the jury heard testimony from two other residents of the neighborhood. As the SJC described their testimony:

>Kerryn Fernandes and her father, Julio Fernandes, observed the shooting as
>they drove by the park, although they could not identify the faces of the
>participants. They were on their way to an apartment located one block
>from the park. They parked their vehicle near the park, and as they walked
>from the vehicle to the apartment, Kerryn saw the defendant and Steven
>Kindell walking toward them on the sidewalk. Kindell, whom Kerryn knew
>from the neighborhood and had previously dated, said "hi" to Kerryn. Kerryn
>also knew the defendant, and knew that he and Kindell both lived nearby.
>She recognized the clothes the pair were wearing as identical to the clothes
>of the shooter and his companion on the bicycle, both of whom she had
>observed minutes earlier in the park. She turned to her father and said,
>"Dad, there they are."

Smith, 450 Mass. at 397, 879 N.E.2d at 90–91.

**Howell's and Calhoun's Cooperation with Law Enforcement**

Throughout the trial, both sides acknowledged that Howell and Calhoun were receiving favorable treatment in exchange for their testimony. Although Smith argues that "Howell and Calhoun were allowed to testify at [his] 2001 trial in a manner that led the jury and counsel to

[5]

believe that they were not cooperating in exchange for a bargain with federal law enforcement to avoid enhanced charging and further imprisonment[,]" Pet. Mem. at 2, the record is clear that these witnesses did admit that their cooperation enabled them to avoid lengthy federal sentences.

In its opening, the Commonwealth told the jury that Calhoun had entered into a cooperation agreement, which would help him with a federal court arrest for drug distribution. SA II:256-57. The Commonwealth also said that Howell had entered into an agreement with the Commonwealth to help him with a drug charge he had pending in Suffolk County. SA II:257. In addition, Smith's attorney, in her opening, advised the jury that Calhoun and Howell were testifying in exchange for "get out of jail free cards." SA II:267-68.

Defense counsel also cross-examined these witnesses about their prior convictions and the impact of their cooperation with the Commonwealth. For example, defense counsel explored the fact that Howell had pleaded guilty in 1993 to federal charges of conspiracy to distribute heroin, for which he was sentenced to 2 years of incarceration followed by 5 years of probation. SA II:329-30. She also explored the fact that Howell did not provide any information about the shooting for 8 years, until he was arrested for drug charges in Suffolk Superior Court in 1998. SA II:358. The jury heard that he plead guilty to those charges while he was in federal custody, and that in exchange for his testimony against Smith, he did not have to serve any time on the new state charges, which were placed on file. SA II:358-59. In addition, Howell testified that as a result of his deal, and his state charges being placed on file, he avoided having to serve additional time for violating his federal probation on his 1993 charges. SA

[6]

II:359-60. Thus, Howell admitted that he "got a double benefit" on both his federal and state charges as a result of his agreement to testify against Smith. SA II:360.

Similarly, the fact that Calhoun was arrested in 1993 on federal drug charges, for which he eventually served 2 years, followed by 4 years of supervised release, was also introduced into evidence. SA II:431-32. Calhoun testified that he provided information to law enforcement about the 1991 shooting in 1994, while in federal custody, in order to get a deal on his sentence. SA II:431, 451-53. In 1994, he identified Smith. SA II:447-48. He testified further that while he was not "getting anything" from the Commonwealth as a result of his cooperation, he gave the information about the shooting to law enforcement in 1994 so that he could get a deal with the federal government. SA II:432, 451. In particular, Calhoun testified that while he faced penalties of life in prison with a minimum mandatory of 10 years in jail on his 1993 federal drug charges, as a result of his cooperation he served only 2 years in jail. SA II:452-53. Finally, in her closing, defense counsel argued that both Calhoun and Howell were exercising their "get out of jail free" cards by testifying against Smith. SA III:227-29.

### Smith's Efforts to Obtain Information

As evidenced by the trial testimony described above, Smith had evidence about the witnesses' cooperation with the state and/or federal authorities. Nevertheless, he consistently requested additional discovery. For example, but without limitation, prior to trial Smith sought additional information about the witnesses' cooperation, including "debriefing statements, memoranda, investigative notes and reports," and sought to have the state ordered to obtain additional information from federal authorities. See, e.g., SA I:160-63, 302-10; SA II:104-111. While state prosecutors repeatedly advised the defendant that they had produced all that they

[7]

had, Smith was insistent that there was more.  See SA II:105-11.  The state court judge refused to order the Commonwealth to seek further information from the federal authorities.  See SA I:332-33, 520, 525-26.

After trial, Smith filed several motions for post-conviction discovery and a motion for a new trial, arguing that other materials relating to the witnesses' cooperation must exist, and should have been provided.  See, e.g., SA I:191, 196-99, 200-05, 209-10, 329-34.  In his motion for a new trial, Smith claimed that while he had been "provided with the text of the plea agreements," the trial judge had erred in failing to order the Commonwealth to seek additional related information from the federal prosecutors, and that "trial counsel dropped the ball by failing to avail herself of the ability to summons persons and documents in an effort to obtain the information via another avenue."  SA I:332-33.  As the SJC described the claimed errors:

> Two of the Commonwealth's witnesses, Odie Calhoun and Damion Howell, had each been convicted in the past of Federal drug offenses.  Both had also entered agreements with prosecutors – Howell with the district attorney's office, and Calhoun with Federal prosecutors – to testify at the defendant's trial in exchange for filing other unrelated drug charges (in Howell's case), or to obtain a reduced sentence (in Calhoun's).  Evidence of these two witnesses' agreements was before the jury.  The defendant argues, however, that the Commonwealth should have been required to request from Federal law enforcement authorities any exculpatory material relating to Howell and Calhoun; he also presents counsel's failure adequately to demand such material as ineffective assistance.

Smith, 450 Mass. at 409, 879 N.E.2d at 99.

The SJC ruled that the Commonwealth was not required to seek additional exculpatory material in the possession of federal authorities in Smith's case because the Commonwealth had already "provided the defendant with evidence of its cooperation agreement with Howell and of Calhoun's cooperation agreement with the Federal government[,]" and there was no

[8]

evidence that additional exculpatory evidence existed. Id. at 410, 879 N.E.2d at 99. In addition, the SJC found that defense counsel was not ineffective in failing to press for additional information. Id. As the court explained, "[c]ounsel used the two cooperation agreements vigorously to attack the credibility of both Calhoun and Howell. Counsel was not required to pursue alternative routes to seek additional statements that might possibly serve the same purpose." Id.

As noted above, Smith's conviction was affirmed by the SJC on January 11, 2008. On January 24, 2008, he sought a rehearing from the SJC, which was denied on April 4, 2008. SA I:656-69. He then sought a writ of certiorari from the United States Supreme Court, which was denied on October 6, 2008. Smith v. Massachusetts, 555 U.S. 893, 129 S. Ct. 202, 172 L. Ed. 2d 161 (2008).

### The Pending Habeas Petition

On March 20, 2009, Smith filed a *pro se* petition for a writ of habeas corpus in this court alleging three grounds for relief: (1) the prosecutor's exercise of a peremptory challenge to exclude a transgendered individual violated the Equal Protection Clause of the Fourteenth Amendment; (2) the trial judge violated Smith's federal Due Process rights when he introduced new inculpatory evidence during his jury instructions; and (3) the trial judge violated Smith's federal Due Process rights when he allowed into evidence a photograph of Smith with two individuals who were identified at trial as members of the Lenox Street gang. Docket No. 1. The respondent moved to dismiss the petition on the basis that Ground Three was unexhausted. Docket No. 15. Counsel appeared on behalf of Smith, and moved to amend the petition so as to proceed on only the first two grounds. Docket No. 19. That motion was

[9]

allowed, and an amended petition was filed, limiting the petition to the two exhausted grounds. Docket No. 20.

## The Stay of the Habeas Proceedings

Smith's counsel withdrew and new counsel was appointed on October 20, 2010. Docket No. 34. On March 2, 2011, counsel filed a motion to stay, seeking leave to return to the state court because he believed that he had additional evidence to support Smith's claim of a constitutional violation arising out of the prosecutor's peremptory challenge of an alleged transgendered potential juror. Docket No. 41. Specifically, counsel argued that he had detected an error in the transcript of the jury selection which, when corrected, established that trial counsel had, in fact, objected to the prosecutor's use of the peremptory challenge as being violative of Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). See Docket No. 42 at 4. In affirming Smith's convictions, the SJC had found that no specific objection had been made. See Smith, 450 Mass. at 406, 879 N.E.2d at 96-97 ("Although in some cases a prima facie case of impropriety may be established by the challenge of a single prospective juror, . . . defense counsel neither objected to the prosecutor's challenge nor asserted that a pattern of improper exclusion actually had been established."). Smith's counsel wanted to exhaust this claim in the state court, and this court allowed the motion to stay on March 30, 2011. Docket No. 50. Petitioner was ordered to commence state proceedings within 30 days, which he did. Id.; SA IV:86-125.

## Subsequent State Court Proceedings

Smith's state court efforts were unsuccessful. Specifically, the Superior Court denied his motion for collateral relief after a non-evidentiary hearing. SA IV:126-28. His first petition for

leave to obtain further appellate review under the "gatekeeper" provision of Mass. Gen. Laws ch. 278, § 33E was denied by a Single Justice of the SJC on March 29, 2013 on the grounds, *inter alia*, that "the discovery of the transcription error does not alter our previous disposition." SA IV:168-69. Smith filed other motions for relief with the trial court seeking a <u>Batson</u> hearing. <u>See</u> SA IV:460. The Superior Court denied these requests on July 18, 2013, and then, again, on May 22, 2014. SA IV:465-67. Smith again sought leave to obtain further appellate review from a Single Justice of the SJC. In a Memorandum of Decision dated December 4, 2014, his request was again denied on the basis that the issue raised was neither "new" nor "substantial." SA IV:468-73.

Smith then returned to this court, where he filed a motion to amend his petition in accordance with a jointly agreed upon schedule. By this motion, he sought to make "stylistic changes to the text of the first two claims," as well as to reflect "exhaustion of Mr. Smith's equal protection claim (prosecutor's peremptory strike of transgendered juror) after having been granted a stay to return to state court[.]" Pet. Mem. re Mot. Amend (Docket No. 111) at 1-2. There was no objection to these amendments, and they were subsequently allowed by this court. Docket Nos. 119, 126. By his motion, Smith also sought to add a <u>Brady</u> violation claim, which the respondent opposed. Pet. Mem. re Mot. Amend at 2.

This court assumed that the <u>Brady</u> issue had been exhausted in state court. Thus, the issue presented was whether Smith's claim of a <u>Brady</u> violation, which was not included in the original habeas petition, related back to his original filing. <u>See</u> R&R at n.3. This court concluded that the proposed amended petition did not relate back to the earlier claims, and was therefore untimely. Consequently, this court recommended that Smith's habeas petition be amended as

[11]

to Grounds One and Two, but that the request to add the Brady claim be denied. R&R at 12. The District Judge adopted the R&R on November 30, 2015. Docket No. 126.

Thereafter, the parties filed supplemental briefs addressing the two issues in the habeas petition. See Docket Nos. 128, 133. However, on January 4, 2016, Smith raised an issue as to whether the Knight Affidavit included information that should have been disclosed to him about Calhoun and Howell's gang involvement, and whether Attorney Barron had a conflict of interest due to his involvement in the case where the Knight Affidavit was filed. See Docket No. 127. That resulted in a sealed hearing before this court, after which it was agreed that the impact of the Affidavit would be addressed in the context of the instant motion to stay. See Docket No. 140.

## The Knight Affidavit

It is Smith's premise that the Knight Affidavit discloses that there were ongoing joint federal-state investigations involving Calhoun and Howell at the time that they agreed to testify against him,[5] and that, as a result, they were under a great deal more pressure to reach a deal since the potential federal penalties were great. Moreover, he argues, that due to the alleged joint investigation, the Commonwealth should have been ordered to produce additional material from federal investigators. Finally, he contends that this Affidavit also establishes that

---

[5] In addition to relying on the Knight Affidavit, Smith also argues that additional, undefined "exculpatory materials were withheld in the form of negotiations with the United States Attorneys' Office, proffers and written or unwritten agreements concerning supervised release revocation and possible federal prosecution for recidivist narcotics distribution of Calhoun and Howell in the period 1997 to 1999." Pet. Mem. at 2. Like before, Smith argues that he believes this material must exist, but he has no proof of its existence. In any event, such information cannot be considered to have been newly discovered since the court's earlier ruling on the motion to amend to add a Brady claim. Therefore, it will not be discussed in detail herein.

[12]

the witnesses were gang members, despite their testimony to the contrary.  However, the Affidavit does not provide this information.

At Smith's trial, the admissibility of evidence relating to gang involvement was contested, with the defense objecting to its admissibility.  <u>See</u>, <u>e.g.</u>, SA I:164-76; II:328-29.  In any event, the victim, Steven Gaul, was identified as being a member of the Columbia Point Dogs ("CPD"),[6] a gang which originated in the Columbia Point area of Boston.  <u>See</u> SA II:263, 455.  Smith was identified as being a member of a rival gang, known as the Lenox Street Gang.  SA II:257.  Both Howell and Calhoun described themselves as being good friends of the victim.  SA II:311, 337, 430-31.  However, they both denied being members of the CPD.  <u>See</u> SA II:346, 454-55.  It is Smith's contention that this is not true.  Thus, Smith argues that "[t]he June 18, 2015 detention affidavit of FBI Special Agent Matthew Knight, released by the government in a cluster of June 2015 federal prosecutions of the Columbia Point Dogs (CPD) street gang, leads to the inescapable inference that percipient witnesses at petitioner's trial, Odie Calhoun and Damien Howell, were CPD gang members or associates in a drug turf war with petitioner's Lennox Street associates."  Pet. Mem. at 1-2.

The Knight Affidavit was filed in a large drug conspiracy case commenced in 2015 against a number of defendants "alleged to be leaders, members, or significant criminal associates of the Columbia Point Dawgs," a gang "alleged to be involved in a host of criminal activities in, among other places, Boston, Massachusetts, Maine, New York, and Georgia."  Knight Aff. ¶ 1.  Howell and Calhoun are not mentioned in the Affidavit.  Smith is not mentioned

---

[6] The gang is referred to either as "Columbia Point Dogs" or "Columbia Point Dawgs."

[13]

either.  In the Affidavit, SA Knight purports to trace the history of Columbia Point from the initial development of a welcomed housing project to a place "ravaged by gang violence and crime[.]"  See id. at ¶¶ 4-8.  Thus, he asserts that "[b]y the mid-1960s, Columbia Point was on the road to deterioration[,]" by the 1970s it had become "severely plagued by crime" and by the early 1980s "the project was largely under the control of gangs and other criminal elements."  Id. ¶¶ 8-9.  By 1989, CPD was purportedly running the housing project, though it was forced to move its drug trafficking activities to other neighborhoods in the 1990s, when the housing project was taken over by a private management company that engaged in a lengthy renovation project, thereby making Columbia Point an inhospitable location for the gang.  Id. ¶¶ 11-12.

According to the Affidavit, in the early 1990s the CPD moved into an area near the Lenox Street housing development, where drug trafficking operations were run by the Lenox Street gang.  Id. ¶ 15.  "During this period, the CPD and Lenox Street engaged in a series of shootings and homicides over drug distribution in the park.  The CPD prevailed and took over control of drug trafficking in Ramsey Park."  Id.  While this period would seem to cover the shooting of Steven Gaul, for which Smith was convicted, there is nothing in the Affidavit which indicates that a federal investigation was ongoing at that time.  Nor is there any reference to Calhoun, Howell or Smith.

According to the Affidavit, "[t]he pattern of the CPD muscling its way into drug territories held by rival gangs continued throughout the 1990s.  The CPD established its authority over drug turf through various neighborhoods of Boston through a pattern of violent shootouts with members of rival gangs," and "emerged from the bloodshed of the 1990s as one

of the two most feared gangs in Boston, along with the Academy Homes Braves in Roxbury."
Id. ¶¶ 16-17. Again, while specific examples are given, there is no mention of Smith, Calhoun or Howell, nor is there any indication of a federal or state investigation of CPD. Rather, in this period the only reference to an investigation is to the "1995 federal Indictment and arrests of over 20 members of the Head Quarter Boys, at the time the largest and most influential Boston street gang[,]" which arrests apparently contributed to "[t]he rise to prominence of the CPD." Id. ¶ 19 n.7.[7]

The Affidavit continues to describe the continued expansion of CPD during the 2000s and the eventual alliance between CPD and the Academy Homes Braves. Id. ¶¶ 20-21. It is alleged that "[b]y 2010, the CPD was known up and down the East Coast as a street gang that was here to stay." Id. at 22. Again, the only reference to a federal investigation in this period is the statement, in a footnote, that "[i]in 2011, Owens Brown, the long-time leader of the Academy Homes Braves, along with 11 other Academy Homes gang members and associates, were charged federally in Boston with various drug trafficking crimes. Brown plead guilty and in 2012 was sentenced to 15 years' imprisonment." Id. ¶ 20 n.8. Finally, the Affidavit continues to describe the continued expansion of the CPD in the 2010s, and the involvement of each of the named defendants in the action in which the Affidavit was filed. Id. at ¶¶ 23-50. The events described therein all took place after 2011, and do not implicate a joint federal/state investigation that would have affected the testimony of Howell or Calhoun. In sum, contrary to

---

[7] To the extent that there was a 1993 federal investigation involving Howell, it was addressed at Smith's trial. See SA II:329-30. Not only is there no mention of the 1993 arrests in the Knight Affidavit, but any such references also would not constitute newly discovered evidence since this court's earlier R&R. See SA I:217 (Docket Sheet for 1993 investigation filed by Smith in state court post-trial proceedings).

[15]

Smith's assertion, the Knight Affidavit does not establish "that Calhoun and Howell were targets of a parallel Boston Police Department and federal gang investigation." Pet. Mem. at 2.

Additional facts will be provided below where appropriate.

### III. DISCUSSION

#### A. Timeliness

By his Second Motion to Stay, Smith is seeking leave to pursue a claim in state court that the Commonwealth wrongfully withheld exculpatory evidence, and to amend his habeas petition accordingly. The record establishes that Smith consistently requested such (undefined) evidence both prior to and after his trial. The SJC eventually rejected his contention that evidence had been wrongfully withheld and/or that his trial counsel was ineffective in failing to seek additional information. See Commonwealth v. Smith, 450 Mass. at 409-10, 879 N.E.2d at 99. Nevertheless, Smith failed to include such a claim in his original habeas petition, which was filed within the one year statute of limitations period established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244(d)(1). As detailed more fully in this court's R&R, adopted by the District Court, Smith's belated attempt in 2015 to add the Brady claim to his habeas petition was untimely as it did not relate back to his original claims. Smith has not requested that the court reconsider this ruling, and there is no reason to do so. See United States v. Davila-Felix, 763 F.3d 105, 108-09 (1st Cir. 2014) (under "law of the case doctrine," a ruling of law "should continue to govern the same issues in subsequent stages in the same case." (citation omitted)).

Smith asks this court to allow him to proceed with his Brady claim because of newly discovered evidence, which renders it timely under the one year statute of limitations

[16]

established by the AEDPA. This court concludes that no further analysis is needed because the Knight Affidavit does not disclose new evidence. For purposes of completeness, however, the court will address Smith's contentions regarding the statute of limitations below.

### B. When Does the Limitations Period Begin to Run?

Under the AEDPA, the one-year limitations period begins to run from the "latest" of several specified dates. One of those dates is "the date on which the factual predicate of the [habeas claim] could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). The phrase "factual predicate" means "evidentiary facts or events, and not court rulings or legal consequences of the facts." Holmes v. Spencer, 685 F.3d 51, 59 (1st Cir. 2012) (citation and punctuation omitted).

Smith contends that he could not have learned about the "revelations of the Knight affidavit" until June 18, 2015, the date of the Affidavit. Pet. Mem. at 11. This argument is not persuasive. To the extent these alleged "revelations" consisted of a federal-state investigation involving Calhoun and Howell, no such "revelation" was made. To the extent the Affidavit discloses gang rivalry between CPD and the Lenox Street gang, that information was known to Smith at the time of his trial and was discussed at trial.[8] To the extent Smith is referring to information that Calhoun and Howell were allegedly CPD gang members, no such information is contained in the Knight Affidavit. However, their friendship with the victim, who was a gang member of CPD, was disclosed at trial. In sum, a review of the Knight Affidavit simply does not disclose new facts which could not have been discovered at an earlier date in the exercise of

---

[8] As noted above, Smith tried unsuccessfully to exclude evidence of the gang rivalry. See SA I:164-76; II:328-29.

due diligence. Therefore, the filing of the Affidavit does not begin the statute of limitations period. See Wood v. Spencer, 487 F.3d 1, 4-5 (1st Cir. 2007) (where basic facts were known at time of trial, but not fully explored, § 2244(d)(1)(D) does not extend statute of limitations).

The AEDPA also provides that if an impediment to the filing of a habeas petition has been "created by State action in violation of the Constitution or laws of the United States . . . [and] if the applicant was prevented from filing by such State action," the statute of limitations does not begin to run until the date on which the impediment is removed. Id. at 4 (quoting 28 U.S.C. § 2244(d)(1)(B)). It is an open question in the First Circuit as to whether a Brady violation can constitute a state-created impediment that prevents a defendant from pursuing a habeas petition, or whether more direct state interference, such as denying a defendant access to legal material, is required. Id. at 6. However, even assuming that § 2244(d)(1)(B) can be deemed to encompass a Brady violation, Smith's claim must nevertheless fail. As detailed above, the Knight Affidavit does not reveal any new information about a potential joint federal and state investigation. Therefore, there is no evidence to support Smith's claim that the Commonwealth's failure to disclose evidence precluded him from filing a timely habeas petition. Moreover, this court notes that Smith argued to the SJC that the Commonwealth had failed to disclose exculpatory information. The fact that this claim was not included in Smith's timely habeas petition cannot be attributed to state action.

**C.    Equitable Tolling**

Smith contends that even if his Brady claim is untimely, it should be considered under the doctrine of equitable tolling. See Holland v. Florida, 560 U.S. 631, 645, 130 S. Ct. 2549, 2560, 177 L. Ed. 2d 130 (2010) (one-year statute of limitations under AEDPA may be subject to

equitable tolling). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S. Ct. 1807, 1814, 161 L. Ed. 2d 669 (2005). Equitable tolling is an "extraordinary" remedy and applies only where "circumstances beyond the litigant's control" caused the delay. Cordle v. Guarino, 428 F.3d 46, 48 (1st Cir. 2005) (citation omitted). The doctrine is applied "on a case-by-case basis." Ortega Candelaria v. Orthobiologics LLC, 661 F.3d 675, 680 (1st Cir. 2011).

The instant case does not present the "extraordinary circumstance that equitably tolls the AEDPA limitations period." Riva v. Ficco, 615 F.3d 35, 39 (1st Cir. 2010). As detailed above, the Knight Affidavit does not contain any new revelations. In addition, there is no grounds to attribute any delay in asserting a Brady claim to the actions of the Commonwealth. Equitable tolling is not appropriate here.

Finally, Smith argues that he should be allowed to proceed with his Brady claim especially because he need not show "by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," but only that there is "a reasonable probability of a different result." Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565-66, 131 L. Ed. 2d 490 (1995) (if there is a Brady violation, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."). However, as the trial court and SJC ruled, Smith had obtained all the discovery about Calhoun and Howell to which he was entitled. See SA I:654-55 & n.10; SA II:110-11. The state court ruling that the Commonwealth was not obligated to seek

[19]

additional information from federal prosecutors was consistent with federal law. See <u>United States v. Hall</u>, 434 F.3d 42, 55 (1st Cir. 2006) (federal prosecutor had no obligation under <u>Brady</u> to obtain information about prior convictions in possession of state courts: the prosecutor has no duty to obtain "information possessed by government agents not working with the prosecution"). Smith's trial attorney used the "cooperation agreements vigorously to attack the credibility of both Calhoun and Howell." <u>Smith</u>, 450 Mass. at 410, 879 N.E.2d at 99. The Knight Affidavit does not contain any information that undermines confidence in Smith's trial.

## IV. CONCLUSION

For the reasons discussed herein, this Court recommends to the District Judge to whom this case is assigned that the Petitioner's Second Motion to Stay (Docket No. 143) be DENIED.[9]

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

[9] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See <u>Keating v. Sec'y of Health & Human Servs.</u>, 848 F.2d 271, 275 (1st Cir. 1988); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 604-05 (1st Cir. 1980); <u>United States v. Vega</u>, 678 F.2d 376, 378-79 (1st Cir. 1982); <u>Scott v. Schweiker</u>, 702 F.2d 13, 14 (1st Cir. 1983); <u>see</u> <u>also</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord <u>Phinney v. Wentworth Douglas Hosp.</u>, 199 F.3d 1, 3-4 (1st Cir. 1999); <u>Henley Drilling Co. v. McGee</u>, 36 F.3d 143, 150-51 (1st Cir. 1994); <u>Santiago v. Canon U.S.A., Inc.</u>, 138 F.3d 1, 4 (1st Cir. 1998).